KARN & AL.

*v.*

BLACKFORD & AL.

(*Supreme Court of Appeals of Virginia, June 14, 1894.*)

[20 S. E. Rep. 149.]

**Negotiable Notes—Composition with Creditors—Purchase of Note after Maturity.***

Where, after the acceptance of a note, the payee, in a composition of the creditors of the maker, agrees that the note shall be paid according to the terms of a trust deed, one who acquires the note after maturity holds the same subject to the provisions of the trust deed, though the deed was not recorded when the note was acquired.

**Settlement of Debts of Insolvent Firm—Individual Note of Partner Taken—Novation.**

Where, in settlement of the debts of an insolvent firm, a creditor accepts the individual note of the partner appointed to wind up its affairs, and the firm debts are secured by a trust deed to him of the assets, there is not a novation so as to release the firm assets from the debt evidenced by the note.

**Same—Composition of Creditors—Expenses in Carrying on Business.**

Where, in a composition of the creditors of a firm, one of the members is appointed to carry on the business, and to pay the creditors out of the proceeds, the expenses of carrying on the business should be paid before the creditors are entitled to receive any part of the proceeds.

Appeal from chancery court of Richmond; W. J. Leake,. Chancellor.

---

*See monographic note on "Bills, Notes and Checks," Va. Rep. Anno.

Action by W. M. Parish against C. M. Blackford and others to determine the respective rights of the creditors of the Richmond Brick Company and Snead & Scott. From a decree of the chancery court, defendants Karn and Hickson appeal. Affirmed.

The following is a copy of the opinion of the chancellor, and made a part of the record in the case of Karn and Hickson against Blackford, trustee:

"Karn & Hickson claim that they are the holders of negotiable paper for value without notice of the equity of the deed of January 8, 1885, and that, therefore, they are not bound by the provisions of that deed. Let it be conceded that Karn & Hickson are holders of such paper for value and without notice, yet, as the notes purchased by them were overdue, and had been protested, they must hold the notes subject to the equities existing at the time the notes were purchased, whether they had notice thereof or not. Judge Moncure, in Davis v. Miller, 14 Gratt. 5, says: 'In the case of the transfer of an overdue note, the holder takes it as a dishonered note, subject to all the defenses and equities to which it was subject in the hands of his immediate indorser, whether he has notice thereof or not. He receives nothing but the titles and rights of such indorser.' 14 Gratt. 5, 6. But it is contended that this doctrine thus stated by Judge Moncure does not apply where the equities are collateral, and do not attach to the note itself. In this case the equities do attach to the note itself, and do not arise out of any collateral matter. When the notes were purchased the deed of January 8, 1885, had been executed, and the payment of these notes by said deed had been postponed until all the debts in the first class had been paid. W. B. Snead, the payee of these notes, could not have enforced their payment against the property conveyed in the deed, except subject to its provisions; and Karn & Hickson,

purchasing from him after the dishonor of said notes, could only take what he could have taken. Mr. Daniel, in his work on Negotiable Instruments, treating of this subject, says that the indorsee of overdue paper takes it subject to two defenses: '(1) That it was affected in its inception with some inherent vice,—as, for instance, fraud, illegality or duress; or (2) that the consideration failed, or that payment had. been made, or that there had been accord and satisfaction at the time of the indorsement, or that there was some equitable defense arising out of the transaction in which the paper was given which disabled his indorser, in whole or in part, to recover. Any of these defenses is called an equity attaching to the instrument.' 1 Daniel, Neg. Inst. 725. No one can doubt that these notes in controversy, held by Karn & Hickson, were indorsed by the Richmond Brick Company in the transaction which culminated in the dissolution of that firm, and the execution of the deed of January 8, 1885, although the notes may have been dated a few days prior thereto. This being true, the equity here attached to the notes themselves, and Karn & Hickson take them subject to such equity. But Karn & Hickson further claim that the deed of January 8, 1885, is void as to the debt due them by these notes, because it was unrecorded at the time they purchased the notes. This position cannot be sustained. The deed of January 8, 1885, may have been void as to the notes when Karn & Hickson purchased them, because it had not been recorded, yet when it was recorded it became valid as to all creditors who had not obtained specific liens on the property during the interval between the execution and recordation of said deed. It follows, therefore, that the rights of the parties were fixed by the deed of January 8, 1885, and they could not be changed by any subsequent deeds or agreements of the grantors in said deed, except by the consent of all parties interested. The deeds of February 6, 1886, and of December 11, 1886, were made for the

manifest purpose of giving effect to the deed of January 8,
1885, and for the purpose of hastening the execution of its
provisions.    These deeds contain no unreasonable conditions,
and nothing of which Karn & Hickson have any right to
complain.  .

"This brings us to the construction of the deed of Jan-
uary 8, 1885, for by it the rights of all parties must be de-
termined.    Karn & Hickson contend that their debt is
embraced in the first class of creditors provided for in the
deed of January 8, 1885.    I think a proper construction of
the deed excludes and negatives any such position.    If
their debt of $8,711.37, evidenced by these notes, was in-
cluded in the first class of debts, why provide for its pay-
ment in the second class of debts, and also provide that it
shall be paid after all the debts of the first class have been
paid ?    If it has been paid as a first-class debt, it ceased to
have any existence, and could not be paid again as a second-
class debt.    But Karn & Hickson claim that the debts of the
parties claiming under the deed of January 8, 1885, have
been novated, because after said deed was made the parties
surrendered the notes of Snead & Scott and took the individ-
ual notes of W. B. Snead in the place thereof.    There could
be no novation of these debts in the manner claimed, because
the partners, by the deed of January 8, 1885, authorized
W. B. Snead to conduct the business in his own name, and
in any manner he deemed best, and to pay off these debts as
first-class debts.    The creditors holding notes of the firm
were fully justified, under the terms of said deed, to exchange
their notes of Snead & Scott for notes signed or indorsed by
W. B. Snead alone.    In fact it was a matter of indifference
to either of the grantors in the deed, or to the creditors
secured therein, how the indebtedness was evidenced.    Wil-
liams and Scott were insolvent, and had conveyed all of the
firm assets to W. B. Snead for the payment of the firm debts,
and nothing Williams, Scott, or Snead might do could change

the relations of the creditors to the property conveyed by the deed. The cases referred to by counsel for Karn & Hickson establish a doctrine that is not controverted, namely, that where one accepts a higher or negotiable security for a debt from one of the partners in satisfaction of the debt of the partnership, there is a novation of the debt, and the other partners are released. This doctrine rests upon the intention of the party. If he prefers to take, and does take, in full satisfaction of his debt, a higher security from one partner, it would not be equitable for him to claim the right to pursue the partnership property and the individual property of one partner at the same time. None of the cases cited, however, hold that, where the partnership assets have been conveyed to one of the partners for the purpose of paying the creditors in the order named, surrendering the notes of the firm and taking the note of the partner closing up the business of itself alone operated as a novation of the debt. The leading case, perhaps, in Virginia on this subject is Niday v. Harvey, 9 Gratt. 466, in which Judge Daniel says : 'It may, however, I think, be stated as the well-settled doctrine of this court that whilst the mere acceptance of such higher security by a creditor from one member of a firm for a partnership debt due by simple contract destroys the right of the creditor to proceed at law against the member who was not a party to the giving of such higher security, yet that a court of equity will look at the original character of the debt, and will not withhold relief against the member not uniting in the higher security merely because of the merger and destruction of the legal remedy against him, but will treat that simple contract as still subsisting *in foro conscientia,* unless it is shown that the creditor, by accepting such higher security, intended to abandon all recourse upon his original demand.' If, by taking such higher security, it was not the design of the partners that the social debt should be extinguished, equity will still hold all the partners bound.

The evidence in the case at bar negatives any idea or intention of the parties to extinguish the social debts.   The creditors have been claiming the social assets, and the partners have been all the time acknowledging their liability.   The People's National Bank of Lynchburg may have lost their remedy at law against the other partners by proceeding to judgment against W. B. Snead alone, but they have not lost their rights in equity against the property conveyed in the deed for their benefit.   A merger acts *in personam*, but not *in rem*.   The partners may be released personally, but the partnership's assets are never released ; certainly not, when a deed of trust has been given upon them to secure the debt.   On this subject, in 2 Jones, Mortg. p. 926, it is laid down that a mortgage secures the debt, and not the note or bond or other evidence of it.   No change in the form of the evidence, or mode or time of its payment,—nothing but actual payment of the debt, or an express release,—will operate to discharge the mortgage.   The mortgage remains a lien until the debt it was given to secure is satisfied, and it is not affected by a change of the note, or by the giving of a different instrument as evidence of the debt, or by a judgment at law on the note, merging the original evidence of indebtedness, or by a recognizance of record taken in lieu of the mortgage debt.   2 Jones, Mortg. p. 926.

"The expense of conducting the business and executing the trust in this case, Karn & Hickson contend, should not be paid until all the debts of the firm secured in the deed of January 8, 1885, have been paid.   From the very nature of the transaction involved, such a position cannot be sustained.   Under the deed, W. B. Snead was to conduct the business, and out of the proceeds and profits pay off the debts, etc.   It would be inequitable for the creditors—all of whom acquiesced in his management of the business— if they should be allowed to receive the proceeds and profits, and   yet require that the debts of those who labored or

furnished goods by which the profits were realized be post-
poned.   I think, under a reasonable construction of the
deed, the expenses are first to be paid.   The next position
taken by Karn & Hickson is that the debts of the plaintiff
never were the debts of the Richmond Brick Company, and
should not, therefore, be paid out of the funds derived
from the sale of the property under the deeds.   They con-
tend that these debts are the old debts of Snead & Scott,
incurred prior to the time that Williams became a partner
in the Richmond Brick Company.   The evidence shows
that in 1883 W. B. Snead and J. P. Scott were engaged in
brick making, under the firm name of Snead & Scott ; that
in 1884, H. W. Williams bought for the sum of five
thousand three hundred and thirty dollars and thirty-three
cents one-third interest in the brickyard and fixtures ; that
under the agreement of partnership Scott was to manage
and control the making of bricks ; that H. W. Williams
was to sign all notes and checks, and keep the books of the
firm, and W. B. Snead was to have ten per cent. on all
work done and sales made by him, and the firm name was
to be called the Richmond Brick Company.   Soon after this
agreement was made, Williams was taken sick, and became
unable to attend to business, and left Richmond.   Before
he left he turned over all papers, books, and money belong-
ing to the firm to J. P. Scott.   After the delivery of the
books, etc., the business by and with the knowledge and
consent of all the parties was conducted in the name of
Snead & Scott, and the accounts, assets, and affairs of the
two firms were so commingled that neither of the parties
knew, or seemed to care to know, anything about the status
of the two firms, or the respective rights of the several
partners therein.   The property of the two firms was treated
as the property of the Richmond Brick Company, and the
partners in both firms, by the deed of January 8, 1885,
recognized it as such.   Under the circumstances the Rich-

mond Brick Company became liable for the debts of Snead
& Scott, contracted before the formation of the Richmond
Brick Company.    But, if the court is wrong in this petition,
the evidence shows beyond question that the creditors of the
old firm (Snead & Scott), by and with the consent of the
Richmond Brick Company, which was then conducting
business under the firm name of Snead & Scott, novated
their debts by taking other notes from Snead & Scott repre-
senting the Richmond Brick Company; all parties intending
thereby to transfer the indebtedness from the one firm to the
other.    But, even should the court be in error in holding that
the Richmond Brick Company became responsible for the
old debts of Snead & Scott by conveying the assets, etc., or
by the novation of said debts as aforesaid, yet upon another
ground the debt of Karn & Hickson must be subordinate
to the debts mentioned in the first class of the deed of
January 8, 1885.    Under the claim asserted and the posi-
tion taken by Karn & Hickson, there can be no doubt of
the fact that their notes, so far as they represent the
advancements made by the firm of Snead & Scott, have
been novated, and now represent a debt only against the
Richmond Brick Company.    Now if, on the other hand,
the debts of the creditors other than Karn & Hickson have
not been novated and become the debts of the Richmond
Brick Company, then they still remain as the debts of the old
firm of Snead & Scott.    If, then, there has been no such com-
mingling of the assets, accounts, and affairs of the two firms
as to hold the Richmond Brick Company responsible for the
debts of Snead & Scott, and there has been no novation of
such debts by which the Richmond Brick Company is liable
for such debts, still it must be remembered that at the for-
mation of the Richmond Brick Company the firm of Snead
& Scott owned certainly $16,000 worth of assets, besides
the vacant lot in Manchester, which went into the business
of the Richmond Brick Company, out of which the debts of

the old firm should be paid. Now, if the accounts, assets, and affairs of Snead & Scott can be separated from those of the Richmond Brick Company, will not a court of equity take the money derived from the sale of the brick yard and fixtures and the vacant lot in Manchester and the proceeds of all other assets of Snead & Scott, as well as enough of the assets of the Richmond Brick Company to pay Snead & Scott, and apply them to the payment of the debts of the plaintiffs in preference to those of Karn & Hickson? This equitable disposition will as effectually postpone the payment of the debt due Karn & Hickson as does the deed of January 8, 1885. Now, if the Richmond Brick Company must pay to Snead & Scott the value of the property of that firm, appropriated to its use and in its possession at the time of the execution of the deed of January 8, 1885, before it can pay any of its other debts, then, of course, all the debts of the plaintiffs will be paid, and nothing will be left to satisfy the claim of Karn & Hickson. This discussion has been based upon the assumption that the claims of the plaintiffs were debts of Snead & Scott, and not debts of the Richmond Brick Company. The evidence, I think, shows that a large portion of these debts were contracted by the Richmond Brick Company.

"The objection of Karn & Hickson to the claim of H. M. Smith & Co. because $1,512 of the notes indorsed by them was for their own benefit, and that $1,616 was for the individual benefit of W. B. Snead, cannot be sustained. Commissioner Guy has not allowed H. M. Smith & Co. any part of the $1,512, and the evidence of W. B. Snead proves that the $1,616 was used in the Richmond business, and not for his individual benefit. The objection to the $425 item in account with C. H. Page must also be overruled, because the testimony shows that C. H. Page used said amount for the benefit of the Richmond Brick Company, and not for his own benefit.

1 Va Dec—54

"The other question of fact in the case has been decided in favor of the plaintiff by the commissioner, and, after a careful examination, I see no reason for disturbing his conclusions. A decree may be entered confirming the commissioner's report."

*Christian & Christian*, for appellants.

*Meredith & Cocke* and *Courtney & Patterson*, for appellees.

PER CURIAM. This is a contest between creditors of the Richmond Brick Company and of Snead & Scott for priority. The case was fully examined and reported upon by the master to whom the cause was referred, both as to the facts and law of the case, and the report was confirmed by the court in a written opinion, which was filed with, and made a part of, the record. Upon an examination of the case and the report and opinion aforesaid, we are of opinion that the conclusions reached by the lower court are right, and that its decree must be affirmed, for the reasons stated in the said opinion. Decree affirmed.